OPINION OF THE COURT
Simons, J.
Petitioner, Town of Islip, seeks to enjoin respondents from continuing operation of an adult bookstore in a prohibited zone in violation of the Town’s zoning ordinance. The ordinance differentiates between certain "adult” uses, i.e., bookstores, theaters, motels, cabarets and massage parlors which exclude minors by reason of age and those which do not, and limits the operation of adult uses to areas zoned Industrial I. It also provides that nonconforming adult uses shall be amortized over a period of years based on a graduated scale of investment in the business.[1] The principal issue presented is whether the ordinance constitutes an impermissible limitation of respondents’ constitutional free speech rights.
In a thoughtful and comprehensive opinion by Justice Arthur Spatt the Appellate Division, Second Department, held that the portion of the ordinance that restricted adult uses to the Industrial I zone was a valid exercise of the Town’s zoning power because it restricted only the time, place and manner of respondents’ rights, that it was neither vague nor overbroad and that it provided a lawful means of amortizing noncon *549 forming uses before excluding them from Business I districts. The court invalidated and severed a provision of the ordinance, however, which required adult uses to obtain a special permit before locating in an industrial zone. The Town has not appealed from that portion of the order and thus the issue before us is whether the ordinance as approved by the Appellate Division is constitutionally valid under the Federal and State Constitutions.
I
The Town of Islip is located on the south shore of Suffolk County on Long Island. It consists of 92 square miles of territory and has a population of about 300,000 persons. There are four villages and several hamlets in the Town, each with its own downtown district. In the 1970’s, the Town was faced with an unregulated proliferation of adult uses in these downtown districts and its officials, with the help of professional planners, undertook a detailed study of their effects on the surrounding community. Thereafter, a written report was prepared for the Town, the "Study & Recommendation for Adult Entertainment Businesses” (Report), which indicated the nature of the governmental interest to be protected, i.e., the stability and revitalization of the neighborhoods, and also the harm that adult businesses posed to that interest. It demonstrated, by analysis of each adult entertainment business, the harmful effect of these uses on the surrounding area, and how those effects could be mitigated by relocating the businesses. The study was prepared following the United States Supreme Court’s decision in Young v American Mini Theatres (427 US 50, reh denied 429 US 873) and, consistent with that decision, it recognized the First Amendment concerns involved and sought to accommodate the rights of proprietors with the legitimate goals of sound planning and land use regulation.
Based upon this study, the Town formulated its first written comprehensive plan of community development focusing on revitalizing downtown business areas and reaffirming the identities of its various villages and hamlets. On September 23, 1980, pursuant to the plan, it adopted the adult use ordinance now under consideration. The ordinance attempts to phase out and relocate existing adult uses through a schedule of amortization based upon the user’s investment in the business and to control future adult uses by limiting their establishment to Industrial I districts.
*550 Respondent Caviglia has operated the Happy Hour Bookstore in the heart of the downtown district of the Village of Bay Shore since June 12, 1980 on property he owns with respondent Weinkselbaum. Until 1985 an adult theater was located next to it. The store excludes minors by reason of age and therefore is an adult bookstore within the definition of the ordinance. It is a nonconforming use located in a Business I district but its authorized amortization period has expired and accordingly, petitioner sought to enjoin the store’s operation. Respondents opposed the injunction contending that the ordinance violated their rights under the First Amendment of the United States Constitution and article I, § 8 of the State Constitution. Petitioner moved for a preliminary injunction and both parties moved for summary judgment. Supreme Court denied the motion for a preliminary injunction and both motions for summary judgment. Further, it struck the vagueness defense, determining that respondents lacked standing to challenge the ordinance on vagueness grounds because the ordinance concededly applied to them and they could not assert that claim on behalf of third parties. In 1987 the parties entered into an agreed statement of facts and submitted the matter to Supreme Court for final determination. The court upheld the constitutionality of the ordinance and granted the Town a permanent injunction. It also upheld the amortization provisions of the ordinance and declined to address the vagueness issue, finding that the prior determination of the court was the law of the case. On appeal the Appellate Division modified the judgment by striking the provisions of the ordinance which required proprietors to obtain a special permit before establishing an adult use in an Industrial I district and otherwise affirmed.
II
Analysis starts with a recognition of the broad power of municipalities to implement land use controls to meet the increasing encroachments of urbanization on the quality of life (see generally, Euclid v Ambler Realty Co., 272 US 365; Asian Ams. for Equality v Koch, 72 NY2d 121; Matter of Harbison v City of Buffalo, 4 NY2d 553). These restrictions on the use of real property rest upon and are justified as a proper exercise of the police power to advance the public health, safety and welfare (Berman v Parker, 348 US 26, 32; Udell v Haas, 21 NY2d 463, 469-470). Because zoning ordinances are legislative acts they enjoy a strong presumption of constitu *551 tionality and if there is a reasonable relation between the end sought to be achieved and the means adopted to achieve it the regulation will be upheld (Asian Ams. for Equality v Koch, supra, at 132; McMinn v Town of Oyster Bay, 66 NY2d 544, 549; Shepard v Village of Skaneateles, 300 NY 115, 118). If the issue is "fairly debatable”, the legislative judgment on the necessity for such regulation is to be respected by the courts (Euclid v Ambler Realty Co., supra, at 388; see also, Asian Ams. for Equality v Koch, supra, at 131-132; Matter of Town of Bedford v Village of Mount Kisco, 33 NY2d 178, 186, rearg denied 34 NY2d 668).
Undeniably, the purpose of preventing the deterioration of neighborhoods, including downtown business districts, comes well within the confines of the public welfare that defines the limits of the police power (see, Berman v Parker, 348 US 26, 32-33, supra; see also, 1 Anderson, New York Zoning Law and Practice § 9.27, at 442 [3d ed]). Moreover, planning studies have established that adult bookstores and other adult entertainment facilities are generally injurious to the maintenance and development of healthy commercial and residential areas (see, Toner, Regulating Sex Businesses, American Society of Planning Officials Planning Advisory Service Rep. No. 327 [19]; Interim Report, Boston Redevelopment Authority, Entertainment District Study [Apr. 1974]; see also, Young v American Mini Theatres, 427 US 50, 54-55, supra, relying on District Court’s findings, at 373 F Supp 363, 365; Northend Cinema v City of Seattle, 90 Wash 2d 709, 711-712, 585 P2d 1153, cert denied sub nom. Apple Theatre v City of Seattle, 441 US 946). Accordingly, many municipalities have attempted to control such uses, either by aggregating them (e.g., Renton v Playtime Theatres, 475 US 41) or dispersing them (e.g., Young v American Mini Theatres, supra).
When the municipality’s zoning power is used to regulate bookstores or theaters operating lawfully, however, a First Amendment dimension is added (see, Young v American Mini Theatres, supra; Smith v California, 361 US 147, reh denied 361 US 950). Regulation must not be aimed at suppressing the content of the material shown or sold (Renton v Playtime Theatres, supra, at 47-48; Young v American Mini Theatres, supra, at 67, 71, n 34 [plurality opn]; id., at 79-80, 81, n 4 [Powell, J., concurring]). Notwithstanding this broad injunction against suppressing speech, the Supreme Court has sustained zoning ordinances regulating adult uses, holding that under the Federal Constitution they were not content-based *552 restrictions on expression. The rule, as formulated by the Renton court, permits municipalities to regulate such uses through the zoning power if they can establish that (1) the "predominant purpose” of the ordinance is not to control the content of the material purveyed but to control the "secondary effects” of such uses on the surrounding community, (2) the ordinance is designed to serve a substantial governmental interest, (3) it is narrowly tailored to affect only the category of uses that produce the unwanted effects and (4) it allows for reasonable alternative avenues of expression (see, Renton v Playtime Theatres, supra; see also, Young v American Mini Theaters, supra; cf., Schad v Mount Ephraim, 452 US 61; Erznoznik v City of Jacksonville, 422 US 205; see generally, 3 Rotunda-Nowak-Young, Constitutional Law, Substance and Procedure § 20.47 [a], [e]).
Petitioner’s ordinance meets Federal constitutional requirements under the Renton test. The "predominant purpose” of the Islip officials in enacting their ordinance was to eliminate the secondary effects of adult uses and to attempt to control future development in the business districts, not to regulate expression.[2] The ordinance was prepared after thorough study of the community by professional planners and municipal officials. The Report on which it was based recognized the competing concerns in its first paragraph when it stated that: "This report studies the effects of adult entertainment or sex businesses on surrounding uses, both residential and commercial. * * * Materials or entertainment opportunities offered at these businesses are not a concern of this report.” The research and data underlying the Report supported its conclusion that the presence of such uses had a deleterious effect on the quality of life in the communities of the Town and the ordinance which followed was adopted in conjunction with a comprehensive plan for the development of the Town as a whole. Moreover, in the Bay Shore area, where respondents’ store is located, the ordinance was part of a plan *553 for downtown renewal which involved the investment of over seven million dollars.
Contrary to assertions by the dissent (see, dissenting opn, at 567-568), the Town’s ordinance was predicated on its own study as well as the studies of ordinances prepared by other municipalities. As it related to respondents’ use, the study concluded that there was a "dead zone” in downtown Bay Shore caused, at least in part, by respondents’ store and the adjacent adult theater. Those uses, it found, adversely affected the traffic of customers in the area, resulting in a loss of business of nonadult entertainment stores, and, in the words of the Report, "delayed the upsurge” of downtown Bay Shore. Insofar as other adult uses were concerned, the ordinance did not require six of them (43%) to move and it rezoned some lands Industrial I to accommodate one adult bookstore at its existing location. These actions hardly indicate a purpose to suppress speech because of its content and support the Town’s submission that the predominant purposes underlying the regulations were legitimate zoning concerns (see generally, Yen, Judicial Review of the Zoning of Adult Entertainment: A Search for the Purposeful Suppression of Protected Speech, 12 Pepperdine L Rev 651; Note, Motivation Analysis in Light of Renton, 87 Colum L Rev 344).[3]
The governmental interest supporting the ordinance is the eradication of the effects of urban blight and neighborhood deterioration and furtherance of the general underlying purpose of zoning, the enhancement of the quality of life for the Town’s residents. Studies relied on and prepared by the Town demonstrated that the location of adult businesses in certain areas heightened public apprehension about entering them, thus driving out traditional downtown businesses as customers avoided locations near adult bookstores, increased criminal activity and lowered nearby residential property values. To be sure, planning studies, by their nature, are not scientific nor their predictions certain but the Town was entitled to credit the evidence in its study of past deterioration and the prediction that, unless remedied, the deterioration would continue; it was not required to wait before acting until its business *554 areas became wastelands. The study is more comprehensive than some (cf., e.g., Renton v Playtime Theatres, supra) and the Town’s conscientious effort to preserve the quality of its urban life is entitled to "high respect” (Young v American Mini Theatres, supra, at 71). To be weighed against this is the overriding concern of the First Amendment that there be full opportunity for the free exchange of ideas (Young v American Mini Theatres, 427 US 50, 64-65, supra; Police Dept. v Mosley, 408 US 92, 95, 98-99). The Town’s ordinance does not impose any limitation on the content of the material or the ability of the creators or sellers to distribute it and it does not restrict in any significant way those wishing to acquire adult books from doing so.
Similarly, we note that petitioner’s ordinance is narrowly tailored to affect only those uses shown to produce the unwanted secondary effects (cf., People ex rel. Arcara v Cloud Books, 68 NY2d 553, 558). Respondents fault the ordinance for failing to regulate all bookstores and theaters. The ordinance would be invalid, however, if the Town attempted to zone all theaters and bookstores to an Industrial I zone out of fear the ordinance would be judged content-based if it did otherwise (although it found only adult bookstores and theaters caused the unwanted secondary effects), because it would sweep more broadly than necessary to cure the proscribed evil (see, Hart Book Stores v Edmisten, 612 F2d 821, 830, cert denied 447 US 929).
Respondents also contend that the ordinance is suspect because it does not restrict other noxious uses, such as bars and pool halls, to Industrial I zones.[4] The omission of those uses, if they exist in the Town’s Business I districts, is without legal significance on this record. As the parties seeking to invalidate a legislative enactment, respondents bore the burden of demonstrating that the failure to include other uses was constitutionally significant and they did not attempt to do so by trial, relying instead on stipulated facts which do not support their claim.
Finally, the ordinance meets the Supreme Court’s requirement that it provide alternative locations within the Town for adult use businesses (compare, Schad v Mount Ephraim, 452 US 61, 66, supra; Basiardanes v City of Galveston, 682 F2d 1203, 1213-1214; CLR Corp. v Henline, 702 F2d 637, 639, with *555 Renton v Playtime Theatres, supra, at 54; Northend Cinema v City of Seattle, 90 Wash 2d 709, 717, 585 P2d 1153, supra; Cook County v Renaissance Arcade & Bookstore, 122 Ill 2d 123, 522 NE2d 73, 77-78, appeal dismissed sub nom. Mannheim Books v County of Cook, — US —, 109 S Ct 209). The stipulated facts reveal that the Town contains over 6,000 acres of land zoned Industrial I, including 85.6 miles of running frontage on open roads which are situated on lots over 500 feet from a church, park, playground or residential zone (cf., Basiardanes v City of Galveston, supra, at 1213-1214).
Petitioner presents a far stronger case for sustaining its ordinance than the case in which the City of Renton was successful. Petitioner’s ordinance does not suffer from the underinclusiveness of the Renton ordinance, which excluded massage parlors and adult bookstores, thereby suggesting to Justice Brennan in his dissent (Renton v Playtime Theatres, supra, at 57) that the municipality was not so much interested in controlling the secondary effects associated with adult businesses as it was with discriminating against certain uses because of content. Petitioner’s ordinance made all adult entertainment businesses causing adverse secondary effects subject to the zoning ordinance. Even more significantly, the City of Renton amended its zoning ordinance only after the lawsuit was brought. It conducted no independent studies to identify the harmful secondary effects of each business and establish their existence, as petitioner did, but relied solely on the experiences of other cities. Finally, in Renton, the Federal Court of Appeals made a finding that limiting adult theater uses to the zoned areas was a "substantial restriction on speech”, noting that the zones in which adult uses could operate were not available for immediate use (748 F2d 527, 534, supra). Here, under the stipulated facts it appears that there remains ample space available for adult uses. Respondents do not claim that if the ordinance is enforced the total number of adult bookstores will decline or that fewer potential customers will be able to conveniently patronize them (see, Note, City of Renton v Playtime Theatres, Inc: Court-Approved Censorship Through Zoning, 7 Pace L Rev 251, 279-287 [analyzing the particular weaknesses in the City of Renton’s case]).
ra
This determination does not end the inquiry, however, for respondents contend that even if petitioner’s ordinance is *556 valid under Federal standards they are entitled to protections afforded by the New York Constitution.[5] They rely primarily upon our holding in People ex rel. Arcara v Cloud Books (68 NY2d 553, supra).
Respondents’ claim rests on recognized principles of federalism. State courts are bound by Supreme Court decisions defining Federal constitutional rights but those rulings establish a minimum standard which State courts may surpass so long as their holdings do not conflict with Federal law. Thus, even though the ordinance before us meets Federal standards, under our Nation’s system of multiple sovereignties, New York may interpret its own Constitution to extend greater protection to its residents. A number of considerations are involved in determining whether it does so (see, People v P. J. Video, 68 NY2d 296, 302-303; see also, People v Alvarez, 70 NY2d 375, 378-379, supra). Foremost among those pertinent to this case is a recognition that freedom of expression in books, movies and the arts, generally, is one of those areas in which the Supreme Court has displayed great reluctance to expand Federal constitutional protections, holding instead that the subject is governed essentially by community standards (Miller v California, 413 US 15), and, as we have said before, New York has a long history and tradition of fostering freedom of- expression, often tolerating and supporting works which in other States would be found offensive to the community (People ex rel. Arcara v Cloud Books, 68 NY2d, supra, at 557; People v P. J. Video, supra, at 308-309). For the reasons that follow, however, we conclude that a municipality may, under the circumstances presented, restrict adult business uses to certain areas of the community without violating the State Constitution.
Preliminarily, the nature of the regulation must be examined.
Governmental action may restrict speech either intentionally or incidentally. Intentional restrictions are directed at the message conveyed, either its content or the time, place and manner in which it is disseminated. Generally speaking, if the regulation is content-based it is presumptively invalid and therefore subject to strict scrutiny. However, content-neutral *557 restrictions, those justified without reference to the content of the regulated speech and relating only to the time, place, and manner of expression, are valid if the governmental interest to be achieved outweighs the resulting interference with free expression. Manifestly, such restrictions are purposeful acts which involve varying degrees of prior restraint or censorship.
To avoid being subject to the higher level of scrutiny for content-based restrictions, petitioner’s ordinance does not mention the nature of the material purveyed but defines the uses regulated as those which exclude minors from the premises by reason of age. By so doing, the ordinance allows proprietors to define the uses themselves. Nevertheless, respondents contend that petitioner’s ordinance indirectly identifies uses by the content of the material sold and, therefore, content-based analysis should govern. Petitioner maintains that the ordinance does not regulate content, but only the location of adult uses, and, therefore, time, place and manner analysis is appropriate.
We find neither of these arguments controlling. Although the ordinance addresses only adult uses, it was not a purposeful attempt to regulate speech and its effect on expression is only incidental. The Town did not single out adult uses for regulation because of any hostility to the views expressed in the material they purveyed or in an attempt to insulate the public from their messages but because they produced injurious effects on the Town’s neighborhoods.[6] It enacted the ordinance to address the harms to bystanders, neighboring property owners, just as the Legislature has enacted statutes forbidding the sale of child pornography to address the harm *558 to the juvenile participants rather than to address harm to viewers of the pornography (cf., People v Ferber, 57 NY2d 256). The Town acted to correct the effects of adult uses on community development, not on its citizens’ moral development, and though the legislation enacted to accomplish that purpose has an effect on the expressive component of respondents’ activity that effect is only incidental. The ordinance is not a prior restraint foreclosing the sale and distribution of constitutionally protected materials. On the contrary, it authorizes the location of adult uses, as of right, in several areas of the Town and bookstores selling materials of general interest also may sell adult materials in segregated areas of their stores without being subject to the provisions of the ordinance. Neither does the ordinance constitute censorship because it does not distinguish between the messages that various adult businesses convey. All types of nonobscene sexually explicit materials are covered and may be sold in Islip or purchased by those wishing them. Moreover, the effectiveness of the message contained in adult materials, unlike the effectiveness of the message contained in political speech, for example, is not at all dependent on the place where made.
That the Town’s action was justified by concerns unrelated to speech does not end the inquiry, however (cf., Arcara v Cloud Books, 478 US 697). The dispositive question is whether the Town went too far and enacted an ordinance that had an impermissible incidental effect abridging free expression (see generally, Day, Incidental Regulation of Free Speech, 42 Miami L Rev 491, 499-500, 523-524, 527-528). The applicable State standard for reviewing such regulation is found in People ex rel. Arcara v Cloud Books (68 NY2d 553, supra).
In Arcara the Erie County District Attorney attempted to close a bookstore for one year pursuant to provisions of the Public Health Law relating to public nuisances. He did not claim that the bookstore was guilty of any criminal act, only that customers were engaging in illegal sexual activities on the premises. The District Attorney did not claim that he had attempted to arrest the customers, enjoin their conduct or undertake some less drastic action before closing the bookstore. We found the closure incidentally affected speech and, applying the four-part test of United States v O’Brien (391 US 367, 377), held that although the District Attorney’s action satisfied the first three parts of the test, it could not be sustained because he had failed to demonstrate that the regulation was no broader than necessary to achieve his *559 purpose of policing the criminal conduct (People ex rel. Arcara v Cloud Books, 65 NY2d 324).
On appeal, the Supreme Court reversed, holding that O'Brien did not apply because the District Attorney’s purpose was to prevent conduct by individual customers which had no expressive component and the harm to the bookstore was too remote to implicate First Amendment concerns. On remand, we applied our State standards, concluding that the regulation did indeed affect the bookstore’s rights and held that, under our State Constitution, regulation designed to carry out legitimate and important governmental objectives which incidentally burdens free expression may be sustained only if the State action is "no broader than needed to achieve its purpose” (People ex rel. Arcara v Cloud Books, 68 NY2d, supra, at 558). Although the stated purpose of the District Attorney was not to regulate the content of expressive material, there were obvious means for directly policing the illegal conduct without closing premises on which a lawful business was being operated. In the absence of evidence that such means were not adequate we judged the relief requested by the District Attorney broader than necessary to control the illegal conduct.
The dissenters construe Arcara in absolutist terms contending it requires proof in every case that alternative remedies have been attempted without success and that the proposed regulation is therefore appropriate and no broader than necessary to address the problem. They equate the "no broader than necessary” test with the "least restrictive means” standard used in First Amendment analysis to test regulations incidentally burdening speech and assert that petitioner has failed to satisfy that test.[7]
In this case, unlike Arcara where the asserted governmental interest could have been secured by criminal proceedings or injunction, the adverse affects of adult uses on Islip’s neighborhoods are not subject to direct attack and the Town’s use of its zoning powers was the most appropriate means to address its substantive problems. Manifestly, the zoning regulations are less restrictive than banning adult uses altogether, and more compatible with free speech values than a licensing *560 scheme which arguably could present opportunities for the improper exercise of discretion (cf., Young v American Mini Theatres, 427 US 50, supra). Significantly, the stipulated facts demonstrate that there remains ample space available for adult uses after the rezoning and it is neither claimed nor established that if the ordinance is enforced the total number of adult bookstores will decline or that fewer potential customers will be able to conveniently patronize them.
Arguments can be advanced that different techniques should be used to address the problem, as Judge Titone does in his dissent, but that is not to say that they are constitutionally required. The members of the judiciary are hardly authorities on zoning and planning competent to frame broadly based provisions of an ordinance sufficient to meet the needs of the community and protect it from the harms caused by adult uses. To suggest alternative provisions amounts to nothing more than a disagreement with the Town over how much corrective action is wise and how best it may be achieved. The ordinance adopted is an appropriate method for addressing existing problems; it is not overinclusive and it does not unduly restrict adult uses to limited or unsuitable areas of the Town. Accordingly, the ordinance, as approved by the Appellate Division, is "no broader than needed” for the intended purpose (People ex rel. Arcara v Cloud Books, supra, at 558; see generally, Day, Incidental Regulation of Free Speech, 42 Miami L Rev 491, 528-529) and does not violate the State Constitution.
IV
Finally, respondents challenge provisions of the ordinance which require the termination of nonconforming adult uses. Those provisions authorize amortization of adult uses over a period of llA to 5A years, measured from the 1980 effective date of the ordinance. The particular period of amortization varies depending on the amount of the capital investment in the use. Respondents challenge the Town’s amortization provision as facially unconstitutional because it applies to preexisting uses (they note that the zoning prohibitions in Renton and Young were prospective only) and because they claim the ordinance is content-based regulation.
The general rule against interpreting statutes or ordinances retrospectively, especially where vested rights are involved, applies to zoning ordinances. The intractable problem of elimi *561 nating nonconforming uses, however, has led the courts of this State to sustain amortization provisions if the period allowed to recapture the investment in the use is reasonable (Matter of Suffolk Outdoor Adv. Co. v Town of Southampton, 60 NY2d 70, rearg denied 61 NY2d 670; see, Modjeska Sign Studios v Berle, 43 NY2d 468, rearg denied 43 NY2d 951, appeal dismissed 439 US 809; Matter of Harbison v City of Buffalo, 4 NY2d 553, supra; see also, Annotation, Nonconforming Uses-Amortization, 22 ALR3d 1134). Reasonableness is determined by examining all the facts, including the length of the amortization period in relation to the investment and the nature of the use. The period of amortization will normally increase as the amount invested increases or if the amortization applies to a structure rather than a use. Presumptively, amortization provisions are valid unless the owner can demonstrate that the loss suffered is so substantial that it outweighs the public benefit gained by the exercise of the police power.
Respondents have failed to overcome the presumption. Indeed, they have continued to operate well past the maximum five-year period and they have presented no evidence of economic loss which would establish unreasonableness. Conversely, the Town has established the damage caused to its neighborhoods by adult uses and the substantial investment it has made, particularly in the Village of Bay Shore, to overcome the blight caused in part by them.
Respondents also claim that amortization applied to uses enjoying constitutional free speech protection amounts to content-based regulation and, therefore, legislation regulating them must be prospective or "grandfather-in” existing uses. Since the ordinance is content-neutral under both the Federal and State Constitutions, the amortization provisions rest upon the same legal foundation as such provisions generally and, on the facts presented here, are valid (see, Hart Book Stores v Edmisten, 612 F2d 821, supra [six-month period plus discretionary extensions]; see, Dumas v City of Dallas, 648 F Supp 1061 [three-year amortization period]; Cook County v Renaissance Arcade & Bookstore, 122 Ill 2d 123, 522 NE2d 73, supra [six-month period with extensions]; Northend Cinema v City of Seattle, 90 Wash 2d 709, 585 P2d 1153, supra [90-day period]).
V
Finally, we agree with the Appellate Division that the ordinance is neither vague nor subject to attack for over- *562 breadth for the reasons stated in its opinion (141 AD2d, at 163-164).
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Appendix
The ordinance enacted by the Islip Town Board, in its entirety, provides as follows:
"§ 68-341.1. Adult uses. [Added 9-23-80]
"Adult uses shall be allowable in an Industrial 1 District only as a special exception by the Board of Appeals after public hearing.
"A. Purposes and considerations.
"(1) In the execution of this ordinance it is recognized that there are some uses which, due to their very nature, have serious objectionable characteristics. The objectionable characteristics of these uses are further heightened by their concentration in any one area, thereby having deleterious effects on adjacent areas. Special regulation of these uses is necessary to ensure that these adverse effects will not contribute to the blighting or downgrading of the surrounding neighborhoods or land uses.
"(2) It is further declared that the location of these uses in regard to areas where our youth may regularly assemble and the general atmosphere encompassing their operation is of great concern to the Town of Islip.
"(3) These special regulations are itemized in this section to accomplish the primary purposes of preventing a concentration of these uses in any one area and restricting their accessibility to minors.
"B. Definitions. As used in this ordinance, the following terms shall have the meanings indicated:
"adult bookstore — An establishment having as a substantial or significant portion of its stock-in-trade books, magazines, other periodicals, films, slides and video tapes and which establishment is customarily not open to the public generally but excludes any minor by reason of age.
"adult drive-in theater — A drive-in theater that customarily presents motion pictures that are not open to the public generally but excludes any minor by reason of age.
"adult entertainment cabaret — A public or private establishment which presents topless dancers, strippers, male or *563 female impersonators or exotic dancers, or other similar entertainments, and which establishment is customarily not open to the public generally but excludes any minor by reason of age.
"adult motel — A motel which is not open to the public generally but excludes minors by reason of age, or which makes available to its patrons in their rooms films, slide shows or videotapes, which if presented in a public movie theater would not be open to the public generally but would exclude any minor by reason of age.
"adult theater — A theater that customarily presents motion pictures, films, videotapes or slide shows, that are not open to the public generally but exclude any minor by reason of age.
"massage establishment — Any establishment having a fixed place of business where massages are administered for pay, including but not limited to massage parlors, sauna baths and steam baths. This definition shall not be construed to include a hospital, nursing home or medical clinic or the office of a physician, surgeon, chiropractor, osteopath or duly licensed physical therapist or barbershops or beauty salons in which massages are administered only to the scalp, face, neck or shoulders. This definition also shall exclude health clubs which have facilities for physical exercise, such as tennis courts, racquetball courts or exercise rooms, and which do not receive their primary source of revenue through the administration of massages.
"peep shows — A theater which presents material in the form of live shows, films or videotapes, viewed from an individual enclosure, for which a fee is charged and which is not open to the public generally but excludes any minor by reason of age.
"C. The adult uses as defined in Subsection B above are to be restricted as to location in the following manner in addition to any other requirements of this Code.
"(1) Any of the above uses shall not be located within a five-hundred-foot radius of any area zoned for residential use.
"(2) Any of the above uses shall not be located within a one-half-mile radius of another such use.
"(3) Any of the above uses shall not be located within a five-hundred-foot radius of any school, church or other place of religious worship, park, playground or playing field.
"D. The restrictions enumerated in Subsection C above may *564 be waived by the Town Zoning Board of Appeals if the applicant shows and the Board finds that the following conditions have been met in addition to the general conditions contained in Article XXXIII of this ordinance:
"(1) That the proposed use will not be contrary to the public interest or injurious to nearby properties and that the spirit and intent of this ordinance will be observed;
"(2) That the establishment of an additional use of this type in the area will not be contrary to any program of neighborhood conservation or improvement, either residential or nonresidential; and
"(3) That fifty-one percent (51%) or more of the property owners within the restricted area as defined in Subsection C(l) of this section have signed a petition stating that they have no objection to the establishment of one of the uses defined above.
"E. No more than one (1) of the adult uses as defined above shall be located on any lot.
"F. By amortization, the right to maintain a legal nonconforming adult use shall terminate in accordance with the following schedule:
"Amount of Capital Investment” as of the Effective Date of this Ordinance Date Before Which Use Shall Terminate
0 to 5,000 January 1,1982
5.001 to 8,000 January 1, 1983
8.001 to 15,000 January 1, 1984
15.001 to 22,000 January 1, 1985
22.001 or more January 1, 1986
"note: The term 'capital investment’, as used above, is defined to mean the initial outlay by the owner or operator of the use to establish the business as of the date of the enactment of the ordinance, exclusive of the fair market value of the structure in which the use is located.”

. The pertinent provisions of the ordinance are annexed as an Appendix.

. When applying the predominant purpose requirement of Renton, courts do not invalidate a municipal zoning ordinance simply because one or more legislators sought to suppress protected expression. While Renton requires an examination of a municipality’s motive in enacting the ordinance before examining whether the ordinance is a valid time, place and manner restriction, it is the motive of the Legislature, not individual legislators, that is controlling (see, Walnut Props. v City of Whittier, 808 F2d 1331, 1335-1336). Moreover, even when evaluating the motive of the Legislature, there is a constitutionally significant distinction between an improper motivating factor and an unconstitutional predominant purpose (id.).

. Although the dissent does not accept that the predominant purpose of the ordinance was to eradicate the secondary effects of adult businesses (see, dissenting opn, at 573), evidently respondents do. They did not seek a trial to establish a contrary motive and they have included in their papers a copy of the minutes of the Town Board meeting at which the ordinance was enacted which establish that the Town’s purpose was to eradicate secondary effects.

. In fact, bars have been regulated since 1976, although in a different manner, and no new bars have moved into the downtown area since then.

. Article I, § 8 provides in pertinent part: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”

. The dissent contends that the Town has not suffered from adult uses because land values in downtown Bay Shore have increased since the ordinance was enacted. Although the parties stipulated, for the purpose of this litigation, that real estate values have generally increased in the vicinity of respondents’ bookstore since the ordinance was enacted, petitioner has not agreed, and there is nothing in the record to establish, that the presence of respondents’ stores or of adult uses generally was responsible in any way for this economic improvement. To the contrary, petitioner’s study documents the harm caused by the adult uses and the increase in land values is easily traced to other factors. Disregarding the obvious effects of inflation on land values in Long Island in the nine years since the ordinance was adopted the Town has invested over seven million dollars to develop and improve downtown Bay Shore. Moreover, the zoning change in 1980 has enabled new businesses to invest in the area with the assurance that no new adult uses will be permitted and that existing uses will, in time, be terminated. Indeed, the adult theater formerly located next to the bookstore moved after the ordinance was enacted.

. The Supreme Court, in explaining the "least restrictive means” test has stated that the incidental burden on speech is no greater than essential, and therefore permissible, so long as the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation” (see, United States v Albertini, 472 US 675, 689). Manifestly, petitioner’s ordinance satisfies that test.